IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  1:13-CR-173 |
| | ) | |
| JASON S. SANT, | ) | Honorable Anthony J. Trenga |
| a/k/a "Jason Smith," | ) | |
| a/k/a "Jim Brick," | ) | Sentencing:  September 13, 2013 |
| | ) | |
| Defendant. | ) | |
| | ) | |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States hereby submits its position on the sentencing of the defendant, Jason S.

Sant, in accordance with U.S.S.G. § 6A1.2 and the policy of this Court.  The government

believes that the Presentence Investigation Report (PSR) correctly calculates the applicable

Guidelines range at 188 to 235 months of incarceration, and, as explained below, the government

believes an initial sentence at the bottom of that range would be appropriate in this case.  Taking

into account the government's under seal filing, the government's recommendation for defendant

Sant is a final sentence of 126 months of incarceration.

I.      **Background**

On May 10, 2013, the defendant waived indictment and pleaded guilty to a single count

criminal information charging him with conspiracy to commit mail fraud, wire fraud, and bank

fraud, in violation of 18 U.S.C. § 1349.  As charged in the information and described more fully

in the defendant's statement of facts, the defendant and others engaged in an elaborate and highly

complex mortgage foreclosure rescue scam that victimized hundreds of homeowners, renters,

and lenders nationwide, including within the Eastern District of Virginia, and yielded in excess of $4 million in criminal proceeds for the conspirators.

From 2008 into the beginning of 2013, the defendant and co-conspirator Mark Farhood owned and operated a business that went by various names, including Home Advocate Trustees, Walk Away Today, First Equity Trustees, Home Security Consultants, Sell Fast USA, USA Rental Housing, Volcanic Marketing, MSI Properties LLC, and DSDG Trustees LLC (collectively, hereafter HAT).  Sant, Farhood, and others marketed the business as a way for distressed homeowners to cease paying their mortgages, walk away from their homes, and avoid having a default or foreclosure on their credit report.  Conspirators and HAT employees advertised to homeowners that HAT was in the business of purchasing mortgaged homes subject to the existing mortgages and then negotiating with lenders to purchase the underlying mortgage notes for pennies on the dollar.  On their web sites and in communications with homeowners, HAT claimed that they had a 90% success rate purchasing such notes, that they had a special working relationship with mortgage lenders that facilitated the transactions, that they were the nation's largest volume buyer of short sale and over-leveraged real estate, and that they had been in business for seventeen years with brick and mortar offices in the state of Washington.

Homeowners who "sold" their homes to HAT received fake closing paperwork in the mail and a $10 check that was meant to represent the consideration HAT was supposedly paying for the purchase of their homes.  The homeowners were instructed to execute quit claim deeds in favor of HAT, along with an authorization for HAT to communicate with their lenders regarding their loans, and were instructed to stop paying their mortgage payments and vacate the premises immediately.  HAT instructed the homeowners that only when they stopped making payments would the company gain sufficient leverage with lenders to negotiate the purchase of the notes at

a discount.  Homeowners were further directed to register on a HAT web site and log on frequently for the status of the company's supposed negotiations with their lenders.

All of these representations to homeowners were false.  HAT was not in fact in the business of negotiating for the purchase of mortgage notes, no one from HAT ever even contacted a lender to attempt to negotiate the purchase of a mortgage note, and HAT therefore actually had a 0% success rate (and had HAT tried to negotiate with lenders for the purchase of a note, they would have quickly learned that the lenders do not sell individual notes).  The status updates on the secure HAT web sites reporting on the company's negotiations with lenders were wholly made up.  Rather than having brick and mortar offices in Washington state, HAT employees worked from their homes in southern California, Florida, and elsewhere in the United States, and from overseas locations such as Moldova, Serbia, and the Philippines.  HAT employees used fake names when dealing with homeowners and with others inside the company, and communicated via audio-only Skype internet telephone service in order to conceal their identities from both victims and each other.  The HAT addresses to which victims sent documents or checks were merely mail drops or rent-by-the-hour offices.  And the various HAT web sites on which homeowners relied contained web pages of senior executives with fake names and fake pictures—pictures stolen from other unrelated webs sites without the pictured individuals' knowledge or consent.

The homeowner relief program offered by HAT actually offered no homeowner relief.  Rather, the conspirators preyed on vulnerable distressed homeowners, and the HAT "program" was really just a way for HAT to gain control of hundreds of residential properties nationwide for the bargain price of $10 a house, and then profit from the rental of these properties to unsuspecting tenants.  In order to maximize the rental income they could collect, conspirators,

using the third-party authorization forms executed by homeowners, submitted fraudulent loan modification paperwork to mortgage lenders under the Treasury Department's Making Home Affordable program, which had the legal effect of stalling the foreclosures while the paperwork was pending.  The longer HAT could stall foreclosure on a property under their control—while no mortgage payments were being made—the more rental income they could collect.  Each fraudulent loan modification package sent to a lender included fraudulent bank statements, water bills, financial statements, and other documents, along with cut-and-pasted signatures of the homeowners taken from the closing papers.  The conspirators, in other words, used a Treasury Department TARP program that may have actually helped some of these homeowners modify their mortgages and keep their homes, but they used it simply to commit additional fraud and maximize their own profits at the expense of their victims.

The renters, for their part, believed they were leasing the homes from a legitimate property management company for one and two-year terms, and were not told the houses they were renting were heading toward foreclosure.  Most learned the truth when a foreclosure notice was nailed to their door or they came home to find locks changed.  Frantic renters' calls and emails to HAT seeking relief largely went unanswered.  While federal law does provide such tenants some protections, HAT regularly failed to respond to tenants requests for things as simple as a copy of an executed lease that could be presented to a local sheriff to support a tenant's right to stay in the property.  Because public records did not reflect any HAT ownership of the homes, the tenants were also not considered to have had valid leases on the properties.  Adding insult to injury, HAT had a policy of not returning renters' security deposits, resulting in further harm to evicted tenants.

Since mortgage payments were not being made on the HAT properties and the loan modification applications submitted to lenders were fraudulent, lenders ultimately foreclosed on the properties, resulting in harm to the homeowners' credit.  Given the fraud, it is impossible to know what other options these homeowners might have had in an attempt to keep their homes and/or prevent the ruin of their credit.  Some likely could have afforded to continue paying their mortgage payments and concluded that the HAT program was merely a better option for them.  Others may have been able to successfully negotiate short sales with their lenders, or could have legitimately qualified for a loan modification under the Making Home Affordable program.  And others may have been able to rent out their properties for amounts sufficient to support mortgage payments.

In the end, approximately 400 homeowners "sold" their homes to HAT.  The government's analysis of HAT bank accounts reflects a total of more than $4 million in rental income deposits, which were used to pay conspirators and HAT employees and fund the business's operations, and were otherwise distributed to Farhood and Sant on a roughly 50/50 basis.  The investigation has determined that Farhood used his share of the proceeds to construct a million dollar home in Costa Rica, invest in two Peruvian business ventures, including the Wyndham Cusco Hotel, purchase silver coins, and otherwise fund travel and a comfortable lifestyle.  Sant withdrew the majority of his proceeds from ATMs a short distance from his home in Florida in the form of hundreds of cash withdrawals in amounts under $10,000 (in order to avoid the generation of currency transaction reports).  Sant used his share of the proceeds on real estate, silver, and to fund a comfortable lifestyle.

II.     **Sentencing Argument**

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in

*United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult

[the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d

684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed

district courts to "begin all sentencing proceedings by correctly calculating the applicable

Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The sentencing court,

however, "may not presume that the Guidelines range is reasonable." *Nelson v. United States*,

555 U.S. 350, 352 (2009). The "Guidelines should be the starting point and the initial

benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in

determining the appropriate sentence. *Id.; see also Clark*, 434 F.3d at 685. Ultimately, the

sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

**A.  Guidelines Range**

The government agrees with the Guidelines calculations set forth in the PSR, including

the imposition of the vulnerable victim enhancement, and hereby moves for an additional one

level decrease in the defendant's offense level pursuant to U.S.S.G. § 3E1.1(b).

The whole point of the HAT fraud was to seek out vulnerable and financially distressed

homeowners and to prey on their vulnerabilities, and courts routinely impose vulnerable victim

enhancements in mortgage fraud schemes that target financially distressed individuals. In *United

States v. Porcelli*, 440 Fed. App'x 870, 878 (11th Cir. 2011), a case where the defendant

"specifically targeted individuals who were financially distressed and were in danger of losing

their homes through foreclosure," the Eleventh Circuit explained, "[i]t is clear that having bad

credit or otherwise being in a precarious financial situation is a 'vulnerability' to fraudulent

financial solicitations.  When a fraudulent loan scheme is specifically addressed to persons with bad credit, it targets the most desperate victims," *id.* (citations and internal quotation marks omitted).  In *United States v. Holmes*, 60 F.3d 1134, (4th Cir. 1995), where the defendant perpetrated a mortgage fraud scheme that targeted borrowers with poor credit who could not obtain loans elsewhere, the Fourth Circuit explained, "[i]t is manifest that persons with poor credit ratings who have been turned down elsewhere for loans would be unusually vulnerable, that is, more prone than most to yield to the melodious beseeching of a charlatan who assures them that their dreams are within their grasp."  And in *United States v. Ballesteros*, 410 Fed. App'x 692, 693 (4th Cir. 2011), where the defendant marketed a fraudulent "foreclosure reversal program" to "financially distressed homeowners," the Fourth Circuit again affirmed the imposition of a vulnerable victim enhancement because "the purpose of [the scheme] was to defraud financially vulnerable people," *id.*

## B.  Section 3553(a) Factors

Pursuant to the factors set forth in 18 U.S.C. § 3553(a), the government believes that an initial sentence at the bottom of the 188 to 235 month Guidelines range would be appropriate in this case.

### 1.  The Complexity and Seriousness of the Criminal Conduct

In this case, it is hard to overstate the complexity of the conspiracy and fraud scheme and the harm incurred by its victims.  Indeed, this is likely one of those cases for which it is exceedingly difficult to fully grasp the extent of the fraud without there having been a lengthy trial.  The following selected facts give some sense of the extent of the conspirators' conduct:

- Farhood and Sant directed co-conspirators and employees to use fake names, which were used in both internal HAT communications and when dealing with lenders and

customers. HAT employees and customers knew Mark Farhood as supposed retired attorney "Mark Farley," and Jason Sant as "Jason Smith." To be clear, both Farhood and Sant had other aliases they commonly used even before starting HAT, but they made up new aliases just for HAT in an attempt to protect themselves and further hide their identities.

- The conspirators set up HAT as a virtual business. Conspirators and employees worked from their homes and communicated with each other by email and audio-only Skype. Documents were accessed via the web, and the company's case management system was web-based. Most HAT employees therefore did not know each other's true names and never saw Farhood's and Sant's faces.

- Farhood and Sant recruited contractors from all over the world to work at HAT and serve specific needs, on the rationale that someone working, for example, in Moldova or the Philippines was less likely to contact U.S. authorities or complain if they were treated badly.

- Farhood, Sant, and their co-conspirators worked hard to isolate the fraudulent nature of their business from run-of-the-mill HAT employees. The one aspect of their business that they could not explain away as supposedly legitimate—the creation of fraudulent loan modification applications with doctored documents and cut-and-pasted signatures—was managed by Farhood and farmed out to individuals outside the United States and beyond the reach of domestic law enforcement.

- In order to teach the foreign contractors how to prepare the fraudulent loan modification applications and supporting documents, and so Farhood and Sant would not have to do it themselves for each of the hundreds of homes HAT controlled,

Farhood prepared videos of himself preparing one fraudulent package and placed it on a secure web site for HAT's foreign contractors to view and use as a model. To facilitate preparation of the fraudulent documents, Farhood and Sant also contracted with others overseas to convert a legitimate bank statement and utility bill into pdf-fillable forms, so the other contractors could prepare the fraudulent documents even more easily.

- The conspirators had a stack of fake notary stamps for different states that they used on the fraudulent sale paperwork sent to homeowners and on the fraudulent loan modification applications. The notary stamps usually contained fake names and were purchased on eBay. The investigation has uncovered one notary stamp that was obtained using the true name and license number of a Texas notary, without her knowledge or consent.

- The conspirators actively targeted homeowners who they described as having "the Walk Away mentality," meaning that they would buy into the program, walk away from their homes, and never look back to see what had actually happened with their mortgages. So long as homeowners did not check their credit and notice the foreclosure, they would never know that HAT had not actually purchased their mortgage note. Rather, they would believe they were like the claimed 90% of HAT's customers for whom HAT supposedly achieved success.

- The conspirators submitted paperwork to lenders instructing them only to deal with HAT regarding the homeowners' loans, so after the "sales" of their homes to HAT, homeowners stopped receiving any paperwork from their lenders and had no reason to doubt HAT was doing as it had represented.

- The conspirators created a secure web site where homeowners could log on and check the supposed progress of HAT's negotiations with their lenders, and the conspirators periodically updated these fake statuses to lull the victims.  When homeowners attempted to contact HAT to complain about the progress or success of their program, they were repeatedly directed to consult the secure portal as the sole means of receiving status updates.

- In order to make HAT appear civic-minded, the Walk Away Today website prominently featured the logos of Susan G. Komen for the Cure and Habitat for Humanity, and falsely stated that HAT was "very proud of our 18 year relationship with both Habitat For Humanity, and the Susan G Komen cancer institutes.  10% of our profits each year are donated to these fine institutions."  Of course, no HAT business ever had any such relationship with any charitable institution, and HAT had not been in business for 18 years.

- The Walk Away Today web site also contained a "Team" page that featured pictures and detailed biographies of the company's five most senior executives—all of which information was fake and which pictures were taken from Washington state law firm web sites that had nothing to do with HAT.  The only common theme among the misappropriated photographs is that they were all middle-aged white men.

- In order to help sell the program to homeowners, Farhood and Sant hired an actor and created a fake news story-type interview segment, which was posted online, and in which the actor played the role of an interviewer and Farhood assumed his HAT persona "Mark Farley," supposed attorney and veteran mortgage and banking industry insider, and explained the merits of HAT's program.  Of course, Farhood

could not appear in person in the interview, so a photograph of "Mark Farley"—the same stolen photograph used on the Walk Away Today website—was put on the screen while Farhood did the voiceover and made fraudulent claims about the business.

- At one point in the fraud, Home Advocate Trustees and Walk Away Today began receiving too much negative publicity on the internet, and Farhood and Sant considered shutting down the fraud. Instead, they decided to simply change the name to First Equity Trustees/Sell Fast USA, and held a fake conference call with HAT employees where they falsely explained that the business had been so successful, it had been sold to an investor—a supposed "Alan Garfield"—and that therefore the business names were changing. With new business names, web sites, and email addresses, and a new clean online reputation, the fraud was back up and running.

## 2. Victim Impact

The extent of the defendant and his co-conspirators' fraud is matched only by the severity of the harms incurred by the homeowner and renter victims. As an initial matter, the harms incurred by most individual victims in this case were both pecuniary and psychological. The fraud caused or contributed to many victims' losing their homes or being evicted from rental housing, and it is difficult to overstate the emotional toll taken by such experiences.

Many of the homeowner victims, moreover, had no idea they had been defrauded until contacted as part of this case. As noted above, the fraud targeted individuals with the "walk away mentality," and many homeowner victims, relying on HAT's direction and its supposed 90% success rate, walked away from their homes and mortgages, never looked back, and assumed they were among that successful 90%. In other words, these individuals had not yet had

reason to have their credit checked, because only then would they learn that their homes had actually gone into foreclosure.  Other victim homeowners knew their homes had gone into foreclosure, but HAT told them they unfortunately had been among the supposed 10% of cases where the company had not been successful negotiating with lenders.  When these victims learned of the fraud, they learned for the first time that they were not among the 10%, but the 100%.  Many of these homeowners therefore experienced new pain as they recently learned what really had happened to their homes and their credit.

The government and the Court have received in excess of 150 victim impact statements in this case from lenders, homeowners, and renters, and those statements provide the clearest story of the harm imposed by the defendant and his co-conspirators in this case.  Homeowners report following HAT's direction to immediately vacate their homes following the "sale" of their homes to HAT, unnecessarily incurring moving and rental costs, seeing the rental income generated by their homes flow to HAT and not themselves, and now experiencing the difficulties of ruined credit following the lenders' foreclosure on their properties.

Victim John M. (A12, p. 1-2)[1], a retired veteran with significant medical problems, reports that the fraud has rendered him "an emotional and physical wreck."  Victim Andy N. (A14, p. 6) describes digging "as deep as [he] could on the internet to verify the validity of [HAT]," and finding "written testimonials and videos stating how awesome this was."  He states that in January 2013, HAT "released" his house back to him, after having taken it over in September 2010.  He was faced with evicting tenants (who endured their own pain), over two years of unpaid mortgage payments, and ultimately foreclosure.  He states, "Who knows how

---

[1] The victim impact statements were provided to government and defense counsel on August 5, 2013 in alphabetical order in a series of 19 attachments.  In this filing, they are cited by attachment number ("A_") and page number ("p. _") within that attachment.

many broken marriages, crushed dreams and bankruptcies much less hurt children lay in the wake of this destructive scam."

Many homeowners explain that when they signed up with HAT, they were current on their mortgages or in the process of working on a short sale, and merely concluded that HAT's program was a better option for them:

- Victims Kevin and Leann B. (A2, p. 36-38), who were desperate to sell their home because of increasing crime and its negative affect on their young family, were current on their mortgage and were told by HAT that they needed to become six months behind on their payments before HAT would buy their property—supposedly to aid HAT's negotiations with their lender.  Kevin B. describes the extreme hardship the fraud has caused them, particularly in light of his severe health problems:  "We worked hard for everything we had.  Now we have no home of our own, no credit, and very little money.  Our reputation is ruined.  We are looked upon as losers and failures.  Life is so much harder on my family now because we trusted these people.  I see how my family suffers then read and hear how extravagant the lives these criminal have lived from taking advantage of families like ours."

- Victim Peter F. (A7, p. 24-25), an 18-year Air Force veteran medically discharged, states that he was going to do a short sale, but a HAT realtor affiliate introduced him to HAT and convinced him it was a better option.  After multiple conversations with HAT conspirators, he opted for their program, and now his credit is ruined.

- Victim Joshua G. (A8, p. 17) explains that he "was told by this company to stop paying [his] mortgage and move out.  They would take care of the rest."

- Victim Michael H. (A9, p. 1) states that he was paying his mortgage with rental income, that HAT took over the property and told him to stop paying his mortgage, and that HAT then pocketed the rental payments going forward.

- Victims Nellie and Peter I. (A9, p. 46-48), senior citizens forced to move for health reasons, describe having had nearly $30,000 in equity in their property when they turned it over to HAT.  They describe faithfully following HAT's advice—ceasing mortgage payments, not contacting their lender, leaving everything to HAT—and now having "no property; foreclosure in our name causing severe damage to credit rating, not to mention mental and emotional stress."

- Victim Kevin J. (A10, p. 14) states that had he not been defrauded, he likely could have worked something out with his lender while he sought a new renter for his property, that his property then had equity value, and that now he's lost the house, his investment, and his good credit.

- Victim Othniel J. (A10, p. 15), who reports that at the time he signed up with HAT, he had not yet missed any mortgage payments, sums it up as follows:  "So what was the impact.  I lost $200k, I have no house, now I have a foreclosure on my record, I have to rent.  Emotionally it was the worst, almost cost my marriage.  Finance-wise I struggled, but made it working extra.  I know I will never recover the loss.  But God willing, if I get through these next couple of years, hope it will work out."

- Victims Brian and Cheryl W. (A19, P. 25) describe relocating from Colorado to Maryland for the Army, that they were current on the mortgage on their Colorado home, and that they decided to "sell" to HAT because it seemed like a better option to them than renting the property and dealing long-distance with tenants.  They explain

14

that HAT collected 22 months of rental income on their property before they realized

the home was actually in foreclosure, and that now they are negotiating a short sale

with the lender—something they could have done two years ago.  In the meantime,

their credit is ruined.

Many of the victim homeowners who have now regained possession of their homes,

moreover, face the anguish and added expense of dealing with severe damage and neglect to

their properties.  Victims Gary and Deborah C. (A3, p. 54-61) describe "a horrible feeling we

had been scammed once [they] could no longer make contact with anyone" at HAT, and now re-

gaining possession of their home more than two years later and finding nearly $80,000 of

damage due to renter abuse and HAT's neglect.  Victim Wendy F. (A7, p. 29-30) describes being

defrauded by HAT, re-taking possession of her home after being told she was supposedly one of

their "unsuccessful 10%," and coming up with the funds to settle with her lender, including an

additional $15,000 to repair damage caused by HAT's failure to maintain the home.

The renter victims suffered as well, through eviction and lost security deposits.  Some

victims were both homeowners and renters.  Victim David B. (A2, p. 22) "sold" his house to

HAT, and then rented it back on a two-year lease.  He paid HAT rent for several months *on his

own house*, and then was evicted when the lender foreclosed.  He describes the terrible emotional

toll of "not knowing from one day to the next what to expect."  Victim Lara B. (A2, p. 41-42)

describes finding a foreclosure notice on the door of the home she was renting from HAT, being

told by HAT not to worry and that they were taking care of it, and later being told the house was

foreclosed upon, it was no longer HAT's to rent, and that she and her family had to move out.

She also describes HAT's refusal to return her security deposit.  Victims Ruth and Charles H.

(A8, p. 51-57) and their three young children rented a HAT-controlled property beginning in

November 2011 and signed a lease through May 2014.  After repeatedly being told that HAT would handle the foreclosure notices attached to their front door, the house was sold at auction in April 2013, and they have been forced out.  As they describe their displacement and inability to find a comparable home, they explain that, "We made a home here, not just filled a house.  We have neighbors that are closer than family, a solid church home, a good school system for our kids, a safe environment for them to grow up in—we had.  Most of that has been taken away from us.  Now we have to start over again."  Victim Dawn P. (A14, p. 45) describes coming home to her HAT rental one day to find a sheriff's office employee with an eviction notice.  She explains that she had spent $3,500 in repairs on the as-is rental, that HAT never returned her security deposit, and that she and her large family were thereafter without a home for two months.  Victims Rachel and Justin S. (A16, p. 31) report not having their security deposit returned as well.

Finally, realtor affiliates also suffered.  As part of HAT's sales strategy, they recruited realtors across the country to promote the HAT program to distressed homeowners in the realtors' communities.  Relying on HAT's seemingly professional online presence and the fabricated positive reviews placed online by HAT itself, the realtors unwittingly recruited victims into the fraud.  As some of these realtors report, they have now been named as defendants along with HAT in local civil suits.

### 3.  The Need for Just Punishment

This is not a case where the Guidelines range overstates the severity of the defendant's conduct.  The sentencing range is based on actual gain to the conspirators, not losses influenced by market fluctuations, and reflects real harm to real individuals, not merely faceless financial institutions.  Defendant Sant was a co-creator, co-owner, and co-manager of the criminal

enterprise, he personally profited in the millions of dollars, and he is properly accountable for the entirety of the criminal conduct and the harms to the victims.  A substantial sentence of imprisonment would appropriately reflect the seriousness of his conduct and those harms, it would provide for just punishment, and it would appropriately promote respect for the law.

### 4.   The Need for General & Specific Deterrence

A significant sentence is also necessary and appropriate to afford general deterrence. It is probably in the white-collar context that general deterrence has the most effect, as white-collar defendants often have the most to lose in terms of financial success and other achievements. Accordingly, the greater the sentence imposed on the defendant, the greater the general deterrent effect is likely to be.  Foreclosure relief schemes have become increasingly common, and distressed homeowners have been increasingly popular targets of fraud, given their vulnerability. It is important that any sentence given to the defendant serve as a deterrent to others who contemplate similar conduct.  The message must be that those who defraud homeowners, renters, and others for their own personal gain will be punished appropriately, and that when they do so over an extended period of time and on a large scale, the punishment will be serious.

Specific deterrence is also a concern in this case.  Even before his involvement with HAT, the defendant was involved in a series of real estate transactions in Washington state that resulted in censure by the state securities regulator.

### 5.   The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

The best comparable to this case that has recently been prosecuted in this District is *United States v. Linda Sadr*, 1:10-CR-437-LO, in which the defendant marketed her fraudulent "Mortgage Elimination Program," which homeowners were led to believe would result in the full pay-off of their mortgages in exchange for certain fees paid to the defendant.  Approximately

155 victims lost money in the fraud, and approximately 45 program participants lost their homes as a result of Sadr's actions.  In *Sadr*, the Court assessed a 168 to 210 month advisory range and imposed a sentence of 144 months of incarceration.  The HAT fraud was significantly more complex than Sadr's, had a farther geographic reach, victimized more individuals and more types of individuals, and has caused significantly more harm.  Fairness requires that the HAT conspirators therefore receive a more severe sentence.

Defendant Sant should, however, receive a sentence of imprisonment significantly less than that ordered for co-conspirator Farhood—for the reasons set forth in the government's under seal filing and for the reasons set forth in the government's position on sentencing with respect to Farhood.  While Sant has taken responsibility and cooperated with the government's investigation, Farhood has gone to extraordinary lengths to obstruct justice and to attempt to hide his significant assets from the government.

## III.    Forfeiture and Restitution

The parties will submit a proposed consent order of forfeiture at sentencing calling for the forfeiture of a money judgment in the amount of $2,034,684, along with certain assets in partial satisfaction of that judgment.

The government respectfully requests that the Court defer entry of a restitution order until some later time.  Determination of restitution amounts in this case is a highly complex process, the Probation Office has received, thus far, in excess of 150 victim impact statements, and additional victim impact statements are expected.  The defendant and co-conspirator Farhood, moreover, have both specifically agreed in their plea agreements "that the Court may defer the imposition of restitution until after the sentencing" and "consent[ed] to the entry of any orders pertaining to restitution after sentencing without limitation."  The government is hopeful that

once all victim impact statements have been received and accounted for, a proposed restitution judgment may be submitted to chambers and that a further hearing on the matter may be unnecessary.

**IV.    Conclusion**

Based on the foregoing, the government respectfully submits that an initial sentence at the bottom of the 188 to 235 month Guidelines range would be appropriate in this case.  Taking into account the factors set forth in the government's under seal filing, the government recommends a final sentence of 126 months of incarceration.


Respectfully submitted,

Neil H. MacBride
United States Attorney

By:    _____/s/_____
Paul J. Nathanson
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:  (703) 299-3700
Fax:  (703) 299-3981
Email:  paul.nathanson@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of September, 2013, I electronically filed the

foregoing Position of the United States With Respect to Sentencing with the Clerk of Court using

the CM/ECF system, which will send a notification of such filing (NEF) to the following:

> Derek Andreson
> Laura Bourgeois
> Pillsbury Winthrop Shaw Pittman LLP
> 2300 N St., NW
> Washington, DC 20037
> Tel:  202-663-8000
> Fax: 202-663-8007
> Email: derek.andreson@pillsburylaw.com
>       laura.bourgeois@pillsburylaw.com

A copy has also been sent via email to:

> Carla Coopwood
> Senior United States Probation Officer
> carla_coopwood@vaep.uscourts.gov

                                 /s/

                              Paul J. Nathanson
                              Assistant United States Attorney